E-FILED
Thursday, 19 January, 2023  10:14:04 AM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| AGCS MARINE INSURANCE CO., as subrogee of ASCO POWER TECHNOLOGIES, L.P., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 20-cv-01388-JES-JEH |
| CHILLICOTHE METAL CO., INC., TRANSPORT LOGISTICS, INC., and TRANSPORT NATIONAL, LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

### ORDER AND OPINION

This matter is now before the Court on Motions for Complete or Partial Summary Judgment filed by Plaintiff AGCS Marine Insurance Co. Inc. and Defendants Transport National LLC and Transport Logistics Inc. Plaintiff has filed a Motion (Doc. 59) for Partial Summary Judgment against Defendants Transport National and Transport Logistics, to which Defendants have Responded (Doc. 62), and Plaintiff has Replied (Doc. 68). Defendants Transport Logistics and Transport National have filed a Motion (Doc. 64) for Complete or Partial Summary Judgment, to which Plaintiff has Responded (Doc. 69), and Defendants have Replied (Doc. 72). Plaintiff and Defendant Chillicothe Metal Company Inc. also moved for summary judgment against one another. Those motions are addressed in a separate Opinion. For the reasons set forth below, Motion (Doc. 59) is DENIED and Motion (Doc. 64) is GRANTED in part and DENIED in part.

1

This is a case about a shipment of electrical switchgear that was damaged during transit and who is ultimately responsible for the associated loss exceeding $1.8 million. Plaintiff AGCS Marine Insurance Co. Inc. is standing in the shoes of the original manufacturer of the product (the insured) as it paid out the claim for the loss. AGCS now seeks to recover that $1.8 million from either or both the secondary manufacturer[1] that shipped the product after adding large components to it and the companies involved in the transportation of the product to the end user.

## BACKGROUND

On November 6, 2020, AGCS, as subrogee of ASCO Power Technologies, L.P. ("ASCO"), filed a four-count Complaint to recover losses sustained on or about November 6, 2018, because of damage in the amount of $1,831,166. Hereinafter, the Court refers to Plaintiff as ASCO for ease of reference because the events giving rise to this dispute stem from contracts between ASCO and Defendant Chillicothe Metal Company, Inc., ("CMCO") and Defendants Transport National and Transport Logistics (collectively, "the Transport Defendants"). Plaintiff has alleged the following Counts: Breach of Contract Against CMCO (Count I), Breach of Implied Warranty of Merchantability Against CMCO pursuant to New Jersey Uniform Commercial Code, Section 12A:2-314(e) (Count II), Breach of Bailment against CMCO (Count III), and a Claim under the Carmack Amendment against the Transport Defendants (Count IV). Discovery is complete and all Parties have moved for summary judgment. ASCO and the Transport Defendants incorporate arguments and facts presented in their motions for summary

---

[1] CMCO is a fabricator and vendor of steel enclosures and aluminum enclosures for generators, communication equipment, electrical switchgear, and other products. CMCO SOF 2. It added steel enclosures and steel sub bases to ASCO's electrical switchgear.

2

judgment and responses to one another's; therefore, the Court consolidates and addresses both motions herein.

Unless otherwise noted, the following facts are undisputed. The Court has omitted facts discussed regarding the relationship between ASCO and CMCO. Those facts are described in detail in the Court's Opinion addressing ASCO's and CMCO's summary judgment motions against one another.

Transport Logistics is a Wisconsin corporation licensed by the U.S. Department of Transportation under U.S. DOT No. 2226418, as a freight broker. It was a broker for the shipment of cargo involved in this litigation. It was not a trucking company. Transport National is a Wisconsin-based interstate motor carrier licensed by the U.S. Department of Transportation under U.S. DOT No. 165949. It was the motor carrier that was hired to transport the subject switchgear via five truckloads of cargo on flat-bed trucks, from Chillicothe, Illinois to Ft. Meade, MD. ASCO ultimately paid the freight charges for the shipment of the cargo by Transport National.

On May 29, 2018, Transport Logistics issued to ASCO separate quotes for each of the five truckloads. The five Quotes were numbered 270524 (issued for a weight of 2,300 lbs), 270526 (20,000 lbs weight), 270528 (17,200 lbs weight), 270529 (63,500 lbs weight) and 270531(87,000 lbs weight). *See* Docs. 64-6, 64-7, 64-8, 64-9, 64-10. All quotes, aside from 27024, were issued for a Cargo freight of a "steel storage building." Each quote contained the following language: "Customer is required to declare the value of Cargo prior to shipping otherwise the liability for said property is limited to $.50 per pound, $100,000.00 maximum value, as applicable under 49 U.S.C. 14706(c)(1)(A) and (B) unless specifically agreed to in

writing and appropriate rates or charges applied." The motor carrier services were to be provided pursuant to terms and conditions in its quotes that included an agreement whereby the parties waived any and all rights and remedies provided by Part B to Subtitle IV of Title 49 of the U.S. Code to the extent such rights and remedies conflicted with the provisions of the terms and conditions in the quotes provided by Transport Logistics.

ASCO's Adam Seid made the final decision to choose Transport Logistics as the cargo broker. Part of ASCO thinking was that another motor carrier it had communicated with was more expensive. ASCO received the quotes on July 11, 2018, and each of the five quotes contained a limitation of liability term on page 2, paragraph 13. ASCO did not attempt to amend or modify it, and it did not request a revised quote.

On August 6, 2018, ASCO's Ryan Gobble, Logistics Analyst, sent an email to Scott Eccleston of Transport National and Jacob McKinney of Transport Logistics and Adam Seid and Doug Wilkins of ASCO, that confirmed ASCO's acceptance and use of the quotes. He also asked when delivery would occur. At the time, ASCO did not ask any questions about the quotes it accepted.

Prior to shipment from CMCO, the bills of lading for this cargo shipment were issued by CMCO. They were created based on communications exchanged between ASCO's Adam Seid and CMCO's Mark Reinhold, wherein ASCO explained what was needed in the bill of lading. The Transport Defendants were not involved in their creation. The bills of lading for the cargo only identified CMCO as the shipper. It did not include any valuation for the cargo.

ASCO was the entity that had the information on the value of its cargo whereas the Transport Defendants did not. ASCO never discussed or provided a declared value of the cargo

4

to the Transport Defendants as ASCO had done by email to another motor carrier, Mercer

Transportation, a motor carrier with whom ASCO had frequently worked in the past. ASCO had

never asked Transport Logistics to adjust its quoted prices for a declared value. According to

Transport employee Scott Eccleston, as a matter of general procedure, any customer who wanted

to declare a value of a cargo shipment only needed to inform Transport Logistics or Transport

National by phone or email. The reason for the declaration of value is that any item for transport

valued at over $400,000.00 would require Transport National to purchase additional insurance.

Prior to the shipment of the cargo, ASCO did not have any communications with Transport

Logistics with regard to a declared value for the cargo.

In early November 2018, the cargo freight shipment was all transported on open truck

beds. ASCO had guidelines for shipping electrical switchgear in 2017, but it did not provide

those guidelines to Transport Logistics or Transport National. Nor did ASCO issue any specific

packaging instructions to either CMCO or Transport National, LLC. Transport National truck

driver Matt Woodrum took cellphone photographs of the "saran wrap"[2] that CMCO applied to

the electrical switchgear before he tarped the electrical switchgear at CMCO. He also saw the

wrap was around the sides of the electrical switchgear cargo freight.

The written quotes provided by Transport Logistics did not provide for tarping any part

of the load. ASCO and the Transport Defendants disagree whether they had any direct

conversations regarding requirements for tarping of the electrical switchgear equipment.

However, ASCO does, aside from its criticisms, agree that all the items were tarped that were

supposed to be tarped for shipment. But no one from ASCO had asked Transport National to

---

[2] In its motion for summary judgment against ASCO, CMCO disputes that it used thin "saran wrap."

5

bind and secure the tarps that drivers ended up using on the shipment to Fort Meade, Maryland. Transport National drivers used vinyl tarps on the shipment that were water resistant but not waterproof.[3] The Parties also disagree whether waterproof tarps were available and whether such a tarp would have prevented all water from entering the cargo.

## LEGAL STANDARD

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When presented with a motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). In resolving the motion, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

In order to withstand a motion for summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If the evidence, however, is "merely colorable, or is not significantly probative" or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249-50; *Matsushita Elec. Indus. Co. v.*

---

[3] ASCO admits this fact but adds the tarps did not wrap around the bottom of the switchgear and elsewhere adds that the tarps which were used were meant to cover lumber rather than electrical equipment. ASCO, however, failed to include this in the additional facts section so as to elicit a response from Transport. Therefore, the Court disregards these facts. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643–44 (7th Cir. 2008).

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, in order to overcome the undisputed facts

set forth in a defendant's motion for summary judgment, a plaintiff cannot rest on the allegations

in his complaint but must point to affidavits, depositions, or other evidence of an admissible sort

that a genuine dispute of material fact exists between parties. Fed. R. Civ. P. 56(e)(2); *Behrens v.*

*Pelletier*, 516 U.S. 299, 309 (1996). "[I]f the non-movant does not come forward with evidence

that would reasonably permit the finder of fact to find in her favor on a material question, then

the court must enter summary judgment." *Waldridge*, 24 F.3d at 920. When presented with

cross-motions for summary judgment, the Court must consider the motions separately, which

necessarily means the nonmovant differs depending on the motion being considered. *Schlaf v.*

*Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018) (quoting *Hendricks-Robinson v. Excel*

*Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). This, however, does not alter the standard for

reviewing a motion for summary judgment or the parties' respective burdens.

## DISCUSSION

The Parties agree the shipments containing the electrical switchgear and associated parts

were damaged during transit from Chillicothe, Illinois to Fort Meade, Maryland. The Parties

recognize it was not a supervening force that caused the damage but rather, in some form, poor

packaging by either or both of the Defendants, and/or poor instruction by Plaintiff to the

Defendants. They all point the finger at one another for the damage. As the Court sees it, the real

issue in this case is the Parties' agreement in their respective contracts with one another i.e.,

ASCO with Transport and ASCO with CMCO. Notably, there was no contract between CMCO

and Transport. This Opinion addresses the contract between Transport and ASCO.

Unlike its attempt to enforce its terms and conditions on CMCO, here, ASCO claims Transport's terms and conditions are not enforceable against it; namely, the limitation of liability term. Plaintiff requests the entry of Partial Summary Judgment against Defendants Transport Logistics and Transport National by striking their Fourth Affirmative Defense for enforcement of the $100,000 liability limitation per truckload as provided in the May 29, 2018 quotes from Transport to ASCO. Doc. 59. Plaintiff argues Defendant cannot met the four elements of enforceability as articulated in *Hoover v. ABF Freight System, Inc.*, No. 06-1301, 2008 WL 1805392 (C.D. Ill. April 18, 2008).

The Transport Defendants have moved for summary judgment on Count III against them. First, Defendants argue Transport Logistics is excluded from coverage under the Carmack Amendment because it acted only as a freight broker, as defined in 49 U.S.C. §13102(2). Second, Defendants argue Plaintiff's agreement to a limitation of liability, up to $100,000 per shipment, is enforceable. Third, Defendants argue they were not negligent, and they were not contracted to provide any technical packing, nor did they provide a quote for such work. They assert ASCO and CMCO are responsible for their own omissions or negligence in failing to properly package or load the shipments, which resulted in property damage.

## 1. The Carmack Amendment

Plaintiff's claim against the Transport Defendants is based on the Carmack Amendment, 49 U.S.C. §14706. The Transport Defendants assert summary judgment should be granted as to Transport Logistics because it acted only as freight broker and the Carmack Amendment limits its scope to claims against the delivering carrier or carrier alleged to have caused the loss or damage under 49 U.S.C. §14706(d)(1) and (2). For support, Defendants cite two district court

cases, *CorTransLogistics, LLC v. Landstar Ligon, Inc.*, 489 F.Supp.3d 824, 829 (S.D. Ind. 2020) and *Sompo Japan Ins. Co. of America v. B&H Freight, Inc.*, 177 F.Supp.3d 1084, 1087 (N.D. Ill. 2016). Both cases held the Carmack Amendment does not extend to brokers.

Indeed, the Carmack Amendment, states that a civil action may be brought in a district court against a "carrier" alleged to have caused the loss or damage during the course of an interstate shipment. 49 U.S.C. §14706(d); *REI Transp., Inc. v. C.H. Robinson Worldwide, Inc.*, 519 F.3d 693, 697 (7th Cir. 2008). *CorTrans Logistics* provides ample discussion explaining the difference between a carrier and a broker. 489 F. Supp. 3d at 830 ("'Broker,' by contrast, 'means a person, other than a motor carrier or an employee or agent of a motor carrier that as a principal or agent sells, offers for sale, negotiates for, or holds itself out ... as selling, providing, or arranging for, transportation by motor carrier for compensation.'") (quoting 49 U.S.C. § 13102(2)).

Here, ASCO admits in its undisputed material facts section that Transport Logistics was the broker entity and Transport National was the actual motor carrier of the freight cargo that carried the switchgear equipment to Fort Meade. Moreover, ASCO failed to offer any argument against summary judgment as to Transport Logistics or how it qualified as a "carrier," as opposed to a "broker," therefore, it has waived its opportunity to do so. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011). The Court finds Transport Logistics' request is supported by law and grants the same. Because Plaintiff has alleged no other cause of action against Transport Logistics, it is dismissed as a Defendant in this case. Transport National remains, now referred to as "Transport."

### 2. Limitation of Liability

As articulated in their second amended answer and affirmative defenses, Transport has raised the following affirmative defense:

> That as the freight broker, Transport Logistics, Inc. offered the motor carrier services of Transport National, LLC on accepted terms that included the requirement that the Customer declare the value of the Cargo prior to shipping, which the Customer did not do, resulting in the liability for said Cargo and property being limited to $.50 or fifty cents per pound, and $100,000.00 or a hundred thousand dollars maximum value, as applicable under 49 U.S.C. §14706(c)(1)(A) and (B), and said terms thereby contractually limit the extent of any judgment that Plaintiff may recover against Transport National, LLC and Transport Logistics, Inc.

Doc. 42. If the above limitation of liability clause is enforced, then Plaintiff's recoverable damages are capped at $100,000 per load. Although it is not specified in the briefing, it seems the limit at most would be a recovery $500,000, out of the $1,831,166 sought, since there were five truckloads. The Parties will remain free to argue the maximum limit at trial.

With respect to the limitation clause, the Parties disagree on which factors the Court is to consider in determining whether a carrier has properly limited its liability under the Carmack Amendment. Plaintiff relies on *Hoover v. ABF Freight System, Inc.*, No. 06-1301, 2008 WL 1805392, at *6 (C.D. Ill. April 18, 2008) to articulate four factors:

> A carrier must do four things. First, the carrier must maintain a tariff as required by the ICC. In the tariff, the carrier must list each rate available with terms and conditions for each rate. Among the terms that must be stated in the tariff is the 'released rate' which is the maximum dollar liability per unit of weight for which the carrier will be liable if the cargo is damaged . . . Second, the carrier must give the shipper a reasonable opportunity to choose to accept the proposed limit on liability . . . A "reasonable opportunity" means that the shipper had 'both reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice . . . Third, the carrier must obtain the shipper's written agreement to his choice of that limit. The agreement must specify the released rate and state that the released rate applies unless the shipper expressly requests additional coverage . . . Fourth, the carrier must issue a bill of lading prior to moving the shipment that reflects the agreement.

The test articulated in *Hoover* came from *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir. 1987), the case upon which Transport relies. As was quickly discernable through research, in *Nipponkoa Ins. Co. v. Atlas Van Lines, Inc.*, 687 F.3d 780, 782 (7th Cir. 2012), the Seventh Circuit explicitly stated, "[f]ollowing the enactment of the Trucking Industry Regulatory Reform Act of 1994 and the ICC Termination Act of 1995, the first part of the *Hughes* test is no longer applicable." Therefore, the Court applies the operative three-step test: a carrier must "[1] obtain the shipper's agreement as to a choice of liability; [2] give the shipper a reasonable opportunity to choose between two or more levels of liability; and [3] issue a receipt or bill of lading prior to moving the shipment." *Nipponkoa Ins.*, 687 F.3d at 782 (quoting *Hughes*, 829 F.2d at 1415).

Each of the five Quotes dated May 9, 2018, contain two pages. The first provides the commodity quoted, the dimensions, the weight, total charges, and whether it will be tarped, racked, or self loaded (all answered in the negative). "Chillicothe Metals" is listed as "shipper." The second page includes what appear to be terms and conditions. Paragraph 13 on page 2 states, "Customer is required to declare the value of cargo prior to shipping otherwise [t]he liability for said property is Limited to $.50 per pound, $100,000.00 maximum value, as applicable under 49 U.S.C.14706 (c) (1) (A) and (B) unless specifically agreed to in writing and appropriate rates or charges applied." *See* Docs. 64-6, 64-7, 64-8, 64-9, 64-10.

Despite agreeing that it accepted the Quotes as stated, ASCO argues paragraph 13 is not enforceable because: the applicability of a damage limitation is not referenced on the first page of the Quotes; the Quote did not offer any option to declare the cargo's value or to purchase additional insurance coverage or the rates for it; the language of the limitation is not

11

conspicuous; the Parties did not discuss the damage limitation before this cargo was transported; Transport did not issue a Bill of Lading; and the Bill of Lading and the Quotes did not reflect any signature of ASCO agreeing to the damage limitation. In response, Transport argues it has met all of the requirements to enforce its limitation clause. Specifically, ASCO never asked for rate information, ASCO had a reasonable opportunity to accept the proposed limit because five months passed from Transport supplying the quotes and three months elapsed from ASCO's acceptance of the quotes to the date of the shipment, and ASCO had direct involvement with CMCO in creating the bill of lading, which was issued prior to shipment. Transport also argues the fact that the Transport Defendants did not issue the bills of lading is immaterial under the law. Doc. 62, at 5 (citing *Werner Enterprises v. Westland Maritime*, 554 F.3d 1319, 1328 (11th Cir. 2009)).

Many aspects of ASCO's argument are unpersuasive, such as that the limitation language was not conspicuous, the Parties did not specifically discuss the limitation clause, that Transport was required to provide tariff rates, and the Quotes did not contain ASCO's signature agreeing to any limitation. First, ASCO is likely a sophisticated shipper that has entered into countless agreement with transportation companies. Courts are reticent to protect sophisticated Parties from themselves, including shippers. We at least know ASCO shipped the switchgear to CMCO from California and had conducted business with CMCO prior to this incident. It even had a shipping guide for electrical switchgear that it neglected to share. ASCO also did not dispute deposition statements from CMCO's Mark Reinhold that ASCO's Adam Seid told CMCO what to include in the bills of lading.

Second, ASCO clearly agreed to the two-page Quotes. On August 6, 2018, ASCO, without asking any follow-up questions on the quotes, confirmed its acceptance and use of the Quotes, then asked when delivery would occur. ASCO admitted that it never provided a declared value of the equipment cargo to the Transport Defendants despite having done so to another motor carrier whose quote it did not ultimately accept.[4] This suggests ASCO knew the importance and requirement for stating such. In sum, ASCO cannot now profess ignorance to the bill of lading it directed and authorized, and to terms it clearly agreed to be bound.

A limitation clause is essentially an exchange; the shipper releases the carrier from liability beyond a stated amount in exchange for a low transportation rate. However, a shipper is only bound if "given a full and fair opportunity to obtain greater protection." *Co-Operative Shippers, Inc. v. Atchison, Topeka & Santa Fe Ry. Co.*, 840 F.2d 447, 451 (7th Cir. 1988). The Court easily denies partial summary judgment to ASCO as a reasonable juror could find Transport properly limited its liability. The number of months between the quotes, acceptance, and shipment and clear language in the Quotes of the limitation clause strongly suggest ASCO had a reasonable opportunity to choose. However, the Court cannot say no reasonable juror could find in favor of ASCO on this issue. For example, the jury can determine what effect, if any, the lack of description of how to declare a higher value had on ASCO's reasonable opportunity to choose between two or more levels of liability. The Court also finds the facts surrounding the bill of lading are not fully developed. *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 696 F.3d

---

[4] Interestingly, ASCO also submitted an exhibit in its motion for summary judgment against CMCO wherein it provided values and elected increased coverage for A&A Transfer Inc. to transport what appears to be the replacement switchgear to Fort Meade, for more than double the cost of Transport's services for the first shipment. Doc. 60-10, at 21; *see also* Doc. 60-10, at 23 (wherein ASCO remarks, "I guess with Transport Logistics being at $52K, you get what you pay for."). The terms and conditions for A&A's services also specified that the customer was responsible for shrink wrapping the units. *Id.* at 21.

647, 652 (7th Cir. 2012) (noting a bill of lading can serve many functions, such as evidence of title, or of a transportation contract of carriage between the shipper-consignor and the carrier with terms and conditions binding the shipper and connecting carriers). The bill of lading did not contain terms and conditions or a declared value box, which is a consideration, but ASCO directed its creation, though the extent is unknown. The jury will also be free to consider that ASCO provided another carrier the value of the shipment but not Transport. Nor is the meaning of "two or more levels of liability" fully addressed. ASCO seems to challenge whether Transport provided two levels without further argument and Transport fails to address it.

### 3. Contract & Causation

ASCO does not move for summary judgment on this Count but argues the record shows Transport knew the electrical switchgear needed tarped before shipment, and Transport inadequately tarped the shipment by not using weatherproof tarps, which caused or contributed to causing the damage. Alternatively, ASCO asserts whether Transport was negligent and caused or contributed to the damages to the electrical switchgear is at a minimum a question of fact for the jury.

The summary judgment briefing raises more questions than it answers for the Court. The Quotes provided by Transport do not discuss, either way, who was responsible for packaging. Nor do the Parties provide prior communication between them. ASCO admits it did not send any emails to Transport or written communication to CMCO but repeatedly contends the following: ASCO's Ryan Gobble had two conference calls with Transport Defendants on the need for tarping of the shipment (Doc. 69-1); Transport's Jacob McKinney received an email from Mark Reinhold of CMCO on October 11, 2018 and on the day of shipment reminding him that the

14

switchgear shipment needed to be tarped (Doc. 69-2); and McKinney told Scott Eccleston around October 11, 2018 that the switchgear needed to be tarped and Eccleston told McKinney to update the shipping quotes to reflect tarping (Doc. 69-3). Notably, these contentions by ASCO do not indicate whether it had to be the "waterproof or weatherproof" tarps that ASCO now claims.

It is odd that ASCO knew the electrical equipment was going to be transported via open flatbed trucks (likely a lower cost than an enclosed trailer), yet it did not initially request tarping, at least according to Transport. It is also unclear at what point Transport drivers knew they were transporting electrical equipment. The commodity listed is "steel storage building." And if they knew it was electrical, then how did they expect the shipment to arrive unscathed by weather? There was a section including plenty of comments, yet no mention of particular packaging for this four-million-dollar equipment or the risk of loss for inadequate packaging. For example, in *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, a bill of lading contained the following language, "If Carrier receives the goods already packed into containers: ...(2) Merchant warrants that the stowage and seals of the containers are safe and proper and suitable for handling and carriage and indemnifies Carrier for any injury, loss, or damage caused by the breach of this warranty." 782 F.3d 353, 356 (7th Cir. 2015). Notably, the district court and appellate court also assumed if companies were hired by Plano (the buyer) to pack the molds, then Plano would be liable for those companies' breach of Clause 10(2) just as if Plano itself had packed the container. *Id.* at 357 n. 3.

The Parties dispute what tarping Transport was required to do and what they agreed to do. ASCO points out Transport's representative Stuart Kultgen admitted that waterproof tarps

exist.[5] But according to Transport's Rory Radliff, tarps are not a waterproofing system, as tarps simply keep direct elements of off the product covered by the tarp. Further on that point, Transport's expert report challenges portions of ASCO's expert report.

> Mr. Knobloch incorrectly assumes that Motor Carriers and truck drivers are packaging experts who have technical expertise in packaging standards and best practices. Truckers and Motor Carriers haul a wide range of cargo types. There is not a regulatory requirement or any industry custom / practice that mandates truckers and Motor Carriers assess or become involved with cargo packaging.

*See* Doc. 64-22. At trial, the Parties will be free to introduce their experts on this topic and what, if any, applicable trade usage, should it be appropriate.

Regardless of tarping, it is Transport's position that if the customer or shipper wanted something sent in a waterproof manner, in this instance, they would have had to send the switchgear inside of a trailer that is watertight for the most part if it is not cut open during transit. ASCO disputes whether transporting in a closed trailer was the only way to protect the equipment. ASCO repeats waterproof tarps were on the market, which could have been utilized, but it does not point to any contractual requirement for waterproofing or that Transport had such tarps available. As ASCO shows through its expert, there are various forms of tarping. At the same time, Transport is presumably the "expert" on transportation matters. Part of any carrier's job is to safely move commodities. If Transport knew it was transporting electrical equipment, then did it have an obligation to inform ASCO that regular tarps would not suffice for water damage protection? The only alternative discussed is that after the first shipment arrived damaged, a second shipment encased in boat wrap, arrived undamaged. CMCO completed

---

[5] The Court notes ASCO fails to provide 3 out of 4 pages it cites from Kultgen's deposition (Doc. 69-5) and the information from the one page provided gives little context.

similar services for the second shipment, but Transport had no part in moving ASCO's product. ASCO had guidelines for shipping electrical switchgear but did not share them. At the same time, there is deposition testimony that the guidelines would not have assisted because this was an oversized shipment.

Lastly, the Court must deny summary judgment for Transport because their position assumes that CMCO failed to properly package the shipment. The Court, in a separate Opinion, has granted summary judgment in CMCO's favor finding it did not breach its agreement with ASCO by failing to properly package the shipment. It will be up to a jury to decide whether ASCO "got what it paid with Transport" or if ASCO paid to have more protections than it received.

**CONCLUSION**

For the reasons set forth above, Motion (Doc. 59) is DENIED and Motion (Doc. 64) is GRANTED in part and DENIED in part. Summary Judgment is granted to Transport Logistics only. Defendant Transport National remains as a Defendant in this case.


Signed on this 19th day of January, 2023.

s/James E. Shadid
James E. Shadid
United States District Judge
