## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| AGCS MARINE INSURANCE CO., | ) | |
| as subrogee of ASCO POWER | ) | |
| TECHNOLOGIES, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-01388-JES-JEH |
| | ) | |
| CHILLICOTHE METAL CO., INC., | ) | |
| TRANSPORT LOGISTICS, INC., and | ) | |
| TRANSPORT NATIONAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER AND OPINION

This matter is now before the Court on Motions for Complete or Partial Summary Judgment filed by Plaintiff AGCS Marine Insurance Co. Inc. and Defendant Chillicothe Metal Company Inc. Plaintiff has filed a Motion (Doc. 60) for Partial Summary Judgment against Chillicothe Metal Company Inc. to which Defendant have Responded (Doc. 67) and Plaintiff has Replied (Doc. 70). Defendant Chillicothe Metal Company Inc. has filed a Motion (Doc. 66) for Summary Judgment, to which Plaintiff has Responded (Doc. 71) and Defendant has Replied (Doc. 73). Plaintiff and Defendants Transport National and Transport Logistics have also moved for summary judgment against one another; however, those motions are not addressed in this Opinion. For the reasons set forth below, Motion (Doc. 60) is DENIED and Motion (Doc. 66) is GRANTED.

This is a case about a shipment of electrical switchgear that was damaged during transit and who is ultimately responsible for the associated loss exceeding $1.8 million. Plaintiff AGCS Marine Insurance Co. Inc. is standing in the shoes of the original manufacturer of the product

(the insured) as it paid out the claim for the loss. AGCS now seeks to recover that $1.8 million from either or both the secondary manufacturer that shipped the product after adding large components to it and the companies involved in the transportation of the product to the end user.

## BACKGROUND

On November 6, 2020, AGCS, as subrogee of ASCO Power Technologies, L.P. ("ASCO"), filed a four-count Complaint to recover losses sustained on or about November 6, 2018, asserting damages in the amount of $1,831,166. Hereinafter, the Court refers to Plaintiff as ASCO for ease of reference because the events giving rise to this dispute stem from contracts between ASCO and Defendant Chillicothe Metal Company, Inc., ("CMCO") and Defendants Transport National and Transport Logistics ("Transport Defendants"). Plaintiff has alleged the following Counts: Breach of Contract Against CMCO (Count I), Breach of Implied Warranty of Merchantability against CMCO pursuant to New Jersey Uniform Commercial Code, Section 12A:2-314(e) (Count II), Breach of Bailment against CMCO (Count III), and a Carmack Amendment Claim against the Transport Defendants (Count IV). Discovery is complete and all Parties have moved for summary judgment. ASCO and CMCO incorporate arguments and facts presented in their motions for summary judgment and responses to one another's; therefore, the Court consolidates and addresses both motions herein.

Unless otherwise noted, the following facts are undisputed. Since 2017, Schneider Electric has owned ASCO, which is a manufacturer of electrical switchgear. In 2018, ASCO manufactured a certain generator and paralleling switchgear package for its customer, non-party Alban CAT Power Systems, which was to be used at a military installation in Fort Meade, Maryland. Chillicothe Metal Company, Inc., ("CMCO") is a fabricator and vendor of steel enclosures and aluminum enclosures for generators, communication equipment, electrical

switchgear, and other products. It is located in Chillicothe, Illinois. CMCO does not manufacture

electrical switchgear and it did not fabricate the electrical switchgear at issue in this case. Rather,

it added steel enclosures and steel sub-bases to ASCO's electrical switchgear and had worked

with ASCO on projects prior to 2017.

**The Quotes and Purchases Orders**

In January 2017, CMCO provided a written quote for goods and services to ASCO

for use with an ASCO 15kV switchgear lineup. The goods quoted by CMCO were steel

enclosures and steel sub-bases for the electrical switchgear, and the quoted services were

mounting the electrical switchgear onto the sub-bases. CMCO did not include freight or shipping

costs or arrangements in its quote. Nor did it include packaging for the interstate shipment. The

page of the quote indicating the price included, "F.O.B. Chillicothe, Illinois." In March 2017 and

on May 8, 2017 and May 12, 2017, CMCO sent revised quotes for goods and services to ASCO.

They did not include freight, shipping, or packaging, but did include, in bolded letters, "F.O.B.

Chillicothe, Illinois" on the fourth page alongside the included price.

In July 2017, ASCO drafted the initial purchase order for the goods and services CMCO

was to provide. The initial purchase order contained shipping terms of FOB Destination and

stated, "Deliver to Jobsite Fort Meade, Maryland by 2-19-2018." Then the following exchange

occurred on September 18, 2017: ASCO contacted CMCO indicating that ASCO had recently

transferred the project to ASCO's Stockton, California location and so it issued a new purchase

order with a new purchase order number. Matt Gerber from CMCO responded to ASCO asking

how ASCO arrived at the price on the purchase order because CMCO showed the cost to be

lower, at $301,100. His email was forwarded to Adam Seid, ASCO's Director of Project

Management since 2014, who was responsible for maintaining processes, procedures, and

overseeing execution of projects. Seid responded that ASCO arrived at the number by including

expenses for freight and shipping, for a total addition of $22,428, to be covered by CMCO.

In addition to earlier stating "freight is not within our scope of supply." Gerber told Seid,

I did not, nor would I ever, agree to pay the freight costs. It is simply not CMCO's policy to get involved with the freight other than coordinating the trucks. That is why I provided you with the freight quote from the carrier rather than include it on my quote. The freight is the responsibility of ASCO or others. This is why we put "F.O.B. Chillicothe" on our quotes.

Thereafter, ASCO apologized, stating

Matt [from CMCO],

That was a misunderstanding on my part. I thought that freight was covered by Chillicothe, so I asked to have the PO amount include the freight when issued.

Jobyna [from ASCO],

I made a mistake with the amount of the PO. The amount that Matt states, $301,100, is correct – the freight estimate should be subtracted. As per the email below from Matt, we will have to pay the freight separately (not handled by Chillicothe).

On September 19, 2017, ASCO sent a revised purchase with a corrected price and

with the term, "F.O.B. Your Dock." There were no terms and conditions attached to the revised

purchase order.

ASCO's routing guide was attached to the revised PO. It did not contain any guidelines

or instructions for packaging. It did not reference anything about industry standards for

protecting electrical equipment during shipment. ASCO had guidelines for shipment of electrical

switchgear in 2017, but it did not provide those guidelines to CMCO. On February 1, 2018,

ASCO sent CMCO a new PO, number 942930, with the delivery date changed to May 9, 2018.

The price was $301,100 and shipping term was "FOB Your Dock." Doc. 66-11. There were no

standard terms and conditions attached to the revised purchase order.

4

CMCO disputes whether ASCO's Standard Terms and Conditions were incorporated by reference or by attachment, to the Parties' Purchase Order agreement. For example, the purchase orders did state "This contract is placed subject to the conditions on the reverse side of this form" but no terms and conditions were attached. CMCO, however, does not dispute what these terms state but do dispute their applicability and how they are to be read with the FOB freight term. Section 2 of the Terms and Conditions, in part states, "All materials shall be suitably packed, marked, loaded and shipped in accordance with the requirements of common carriers. Damage to any material not so packed with be charged to Seller." Pursuant to the Purchase Order, "Seller" referred to CMCO and "Buyer" referred to ASCO.

### The Shipment to ASCO and Preparation for the Second Shipment

The electrical switchgear in this case was manufactured by Square D, another division of Schneider Electric. ASCO integrated the control devices and wiring, performed testing of the switchgear integrated controls, and then shipped sections of it from its Stockton California location to CMCO's facility in Chillicothe, Illinois. When ASCO's carrier delivered the electrical switchgear sections to CMCO's facility, the electrical switchgear was wrapped in clear plastic wrap. After arriving, CMCO manufactured the sub-bases and mounted the electrical switchgear sections onto the sub-bases. It also manufactured the steel enclosures. CMCO designed, built, chose construction materials, and performed quality assurance and/or quality control on the construction of the enclosure.

On July 11, 2018, Mark Reinhold from CMCO sent ASCO an email with attached freight Quotes from a local carrier. He also made clear,

> Please Note: CMCO has not supplied freight in our scope of supply, Shipping and shipping arrangements are solely responsibility of ASCO.

5

We have requested the attached freight quotes from our local freight carrier per the general outline drawing for your use, let us know if you want to use Transport Logistics, freight billing would be directly to ASCO.

We require at least 5 days' notice of your carrier's arrival at our plant to ensure that our shipping department will be ready to load your truck.

Adam Seid responded to CMCO that same day and stated, "We want to first look into our own transportation company that we typically use for large loads. If for some reason they indicate that they aren't able to handle a load of this size, then we will go to Transport Logistics." For the next two weeks, ASCO communicated with two of its usual freight carriers regarding shipping the electrical switchgear, enclosures, and sub-bases from Chillicothe, Illinois to Fort Meade, Maryland. One of the other carriers was significantly more costly than Transport Logistics. ASCO ultimately chose (now Defendant) Transport Logistics/Transport National[1] as the carrier for this switchgear and informed CMCO of its decision on July 24, 2018. On July 30, 2018, CMCO sent ASCO an invoice for its services in the amount of $301,100. The invoice reiterated, "F.O.B. Point Our Dock."

On August 6, 2018, and for the next several days, ASCO communicated with Transport regarding when Transport would need to pick the switchgear from CMCO, to go to the job site in Fort Meade Maryland ("Fort Meade") by August 29. CMCO was not involved in those communications. On August 9, 2018, ASCO informed CMCO that it had worked with Transport to coordinate the shipment pickup and that Transport would load the switchgear, enclosures, and sub-bases on August 23, 2018. That same day, ASCO sent CMCO a revised purchase order which it contends, and CMCO disputes, to be the final purchase order agreement between the Parties. On August 15, 2018, ASCO cancelled the original pickup because Fort Meade was not

---

[1] The Court notes these are the undisputed facts for the purposes of the resolution of the motions for summary judgment between ASCO and CMCO. The Court will address the disposition of Transport in the cross motions between ASCO and Transport in a separate Opinion.

going to be able to accept delivery of the equipment on August 28 or 29, 2018. Sometime in August 2018 personnel from ASCO went to CMCO's facility to inspect the sub-bases.

On October 15, 2018, ASCO communicated with CMCO and Transport Logistics, confirming the new dates for delivery of the equipment to Fort Meade to be November 6 and 7. Transport was scheduled to pick up at CMCO on November 1, 2018. At some point, ASCO told Transport the shipment needed tarped. The steel enclosures were to be shipped separately from the electrical switchgear sections, which were mounted onto sub-bases. Prior to pick up, CMCO installed particle board sheets to cover the door openings and open wall section on the steel enclosures. It also installed galvanized plates over the switchgear sub-base floor conduit openings and foam bumpers to protect the instrument screens and handles on the switchgear.

CMCO then wrapped the switchgear sections in clear, plastic wrap. CMCO did not wrap he top or bottom of the electrical switchgear, which was mounted onto sub-bases with galvanized plates over the floor conduit openings. CMCO disputes whether the holes on the top of the electrical switchgear left it open to water infiltration. It claims there is no admissible evidence regarding whether the "holes" were over other metal aspects of the switchgear assembly or over open air or whether water came in through the top of the electrical switchgear.

Several days before the shipment, Transport assigned Matt Woodrum to it and provided him with dimensions and other information about the electrical switchgear. Woodrum has a commercial driver's license and he had been working for Transport National 16 months leading up to the November 2018 shipment. He had previously hauled electrical equipment and dozens of shipments that needed tarped. On the day of the shipment from CMCO, Woodrum drove one truck carrying the switchgear while Pete Moser drove the other truck. Moser and the other Transport drivers of the two other trucks had been with Transport at least as long as Woodrum.

**The Shipment from CMCO to Fort Meade**

Before loading the switchgear onto his truck, Woodrum walked around it and determined there was no visible damage. He also inspected the plastic wrap applied by CMCO around the switchgear and checked how thick it was. He observed that the wrap overlapped, and it was all the way around the switchgear one time to cover it. Woodrum did not ask CMCO to do any additional protection or packaging of the switchgear. After Woodrum said something to someone at CMCO about the plastic wrap, they discussed tarping. Woodrum then determined the switchgear was balanced on his trailer and he added tarping. After loading his truck, Woodrum went back to assist Moser with loading and tarping the other switchgear.

Woodrum did not note any problems with the shipments on the bill of lading. He took pictures of how he secured the switchgear and sent them to his dispatcher to determine whether anything was missed. At the time of loading, Transport did not notify CMCO that it failed to meet the carrier's requirements for shipment. Nor did ASCO reject the goods at this time.

The following day the Transport drivers left from CMCO. Various individuals associated with the government and the project construction company inspected the shipment when it arrived in Fort Meade. ASCO's client, Helix Electric, ultimately rejected it because of water intrusion in the switchgear.[2] *See* Doc. 66-24 (showing photos the water on the shipment). As a result, an analysis of the cost to rebuild the parts of the switchgear found the damage by the water infiltration totaled $1,831,166. Doc. 74-14.

---

[2] CMCO disputes whether it was also contaminated with road dust because ASCO fails to offer evidentiary support. Doc. 73, at 3. The Court does not find this fact to be material given that the Parties agree water infiltration was the main cause of the damage and the reason the customer rejected it. The Parties rarely address "dust" in any of their briefs, nor do they explain why dust, as opposed to water, matters. Additionally, CMCO attached an Exhibit to its brief clearly showing dust on at least one small portion, an exterior GPS component. *See* Doc. 66-24, at 10.

8

ASCO determined the switchgear was damaged during transit from CMCO. AGCS insured ASCO for the shipment and paid for its losses because of it. The rebuild cost was paid based upon a payment of $1,822,622 by AGCS and a deductible payment by ASCO of $8,544. At the time of the rejection in November 2018, Helix Electric also requested that Schneider Electric personnel investigate the damage to the electrical switchgear.

William Bentz was the Senior Director of Field Service Operations for Schneider Electric at the time. He stated in an internal email "For all – this gear was sold FOB Jobsite per Allan so this is an ASCO and therefore overall SE issue to respond to quickly." Doc. 66-24, at 4. After the rejection, ASCO sent a replacement switchgear to CMCO to be, again, attached to sub-bases for the project. It was wrapped in "boat wrap" affording protection from rain and moisture, which was different than the previous wrap applied.

Terry Monahan was the designer of the electrical switchgear lineup. In December 2018, Schneider Electric's Manager of Insured Claims, Margaret Zucco provided Monahan with CMCO's protocol for packing the switchgear. Zucco asked Monahan if the CMCO protocol was similar to the protocol used by Schneider Electric's other vendors of enclosures. Monahan responded that the galvanized plates installed over the switchgear base floor conduit openings "would seem to be adequate to keep water from getting up into the gear." However, Monahan further stated that the shrink wrap applied to the switchgear "sounds good as long as the underside is protected." Doc. 66-26. In that same email, Monahan also stated, "if the shipping company knows that water is not allowed inside the e-house during the trucking they should be able to achieve this." Barry Rodgers was a senior staff electrical engineer for Schneider Electric. He was also provided with CMCO's protocol for packing the electrical switchgear and stated that he had nothing to add to Monahan's comments.

## LEGAL STANDARD

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When presented with a motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). In resolving the motion, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

In order to withstand a motion for summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If the evidence, however, is "merely colorable, or is not significantly probative" or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249-50; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, in order to overcome the undisputed facts set forth in a defendant's motion for summary judgment, a plaintiff cannot rest on the allegations in his complaint but must point to affidavits, depositions, or other evidence of an admissible sort that a genuine dispute of material fact exists between parties. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). "[I]f the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment." *Waldridge*, 24 F.3d at 920. When presented with

cross-motions for summary judgment, the Court must consider the motions separately, which necessarily means the nonmovant differs depending on the motion being considered. *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). This, however, does not alter the standard for reviewing a motion for summary judgment or the parties' respective burdens.

## DISCUSSION

The Parties agree the shipments containing electrical switchgear and the associated parts for it were damaged during transit from Chillicothe, Illinois to Fort Meade, Maryland. It was not a supervening force that caused the damage but rather, in some form, poor packaging by either or both of the Defendants, and/or poor instruction by Plaintiff to the Defendants. They all point the finger at one another for the damage. But the main issue in this case is the Parties' agreement in their respective contracts with one another, i.e. ASCO with CMCO and ASCO with Transport. Notably, there was no contract between CMCO and Transport. This Opinion addresses the contract between CMCO and ASCO.

ASCO drafted a purchase order and sent it to CMCO to place the switchgear, including electrical equipment, into the enclosure. CMCO was listed as the seller with ASCO listed as the buyer. ASCO argues CMCO was obligated to comply with section 2's proper packaging requirement and bore the risk of loss due to improper packaging because it; acknowledged the Purchase Order Terms and Conditions, did not reject any of the Terms and Conditions, performed the services required by the Purchase Order, and expected payment for its services. Ultimately, it was an error for CMCO to only apply a thin, clear wrap only to the sides of the cargo and not the top of bottom of the cargo.

In its Motion, Plaintiff argues it is entitled to partial summary judgment on the following:

1. that CMCO and ASCO entered into a binding contract through the Purchase Order;

2. that CMCO accepted the contract with the Terms and Conditions and did not reject the provisions of Section 2 of those Terms and Conditions;

3. that CMCO was obligated to comply with the requirement of Section 2 of the Terms and Conditions that, "All materials shall be suitably packed, marked, loaded and shipped in accordance with the requirements of *common carriers*. Damage to any material not so packed with be charged to Seller.";

4. that CMCO failed to comply with this contractual requirement in breach of the contract by failing to suitably pack the cargo for transit; and

5. that the cargo sustained significant water damage during transit as a direct and proximate result of CMCO's breach of the contract

Therefore, Plaintiff asks for judgment finding CMCO liable as a matter of law for breach of the Purchase Order contract and damages in the amount of $1,831,166 sustained by Plaintiff because of CMCO's failure to suitably package the cargo for shipment. *See* Docs. 60, 67, 70.

Recall, ASCO raised breach of contract, breach of implied warranty of merchantability, and breach of bailment claims against CMCO. At summary judgment, ASCO focuses on Count I, that CMCO breached its obligations to comply with the requirement of Section 2 of the Terms and Conditions that, "All materials shall be suitably packed, marked, loaded and shipped in accordance with the requirements of common carriers. Damage to any material not so packed with be charged to Seller." The Court will focus on the same.

In turn, CMCO has moved for summary judgment on Counts I-III of the Complaint. *See* Docs. 66, 71, 73. According to CMCO, ASCO expressly agreed that it was responsible for packaging the switchgear based on the terms of the contract, including its agreement to the shipping term, "FOB CMCO's dock," and the Parties' course of performance. ASCO also chose the carrier, paid the carrier, and directed the work of the carrier. Doc. 66, at 2. ASCO did not

provide CMCO with any special packaging requirements and the Transport Defendant, acting as ASCO's agent, accepted the goods as packaged.

## I.   <u>Breach of Contract (Count I)</u>

The Parties have asked the Court to interpret their contract and they agree Illinois law governs the interpretation. Generally, the construction, interpretation, or legal effect of a contract presents a question of law to be determined by the Court. *Gallagher v. Lenart*, 874 N.E.2d 43, 50 (Ill. 2007); *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 821 (Ill. 2005). That analysis begins with the contract language itself. *Id*. The Court must review the language to ascertain and give effect to the intention of the parties. *Founders Ins. Co. v. Munoz*, 930 N.E.2d 999 (Ill. 2010). The contract must be considered as a whole and every provision, rather than in isolated parts. *Id*. at 1004; *Gallagher*, 874 N.E.2d at 58. "The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself." *Gallagher*, 874 N.E.2d at 58 (citing *Martindell v. Lake Shore National Bank*, 154 N.E.2d 683 (Ill. 1958)).

If there are no ambiguities in a contact, then it must be construed according to the plain and ordinary meaning of its terms. *River v. Commercial Life Ins. Co.*, 160 F.3d 1164, 1169 (7th Cir. 1998). "A court should not search for ambiguity where none exists. Mere disagreement about the interpretation of a [] contract does not render it ambiguous." *Id.* (citation omitted). Any ambiguities in the provisions of a contract are generally construed against the drafter of the contract. *Id*. A provision may be considered ambiguous if the policy language is susceptible to more than one reasonable interpretation and in that case, the court can consider extrinsic evidence to determine the Parties' intent. *Founders*, 930 N.E.2d at 1004; *Gallagher*, 874 N.E.2d at 58. Extrinsic evidence can include prior negotiations, statements between the parties, and

course of performance. *See Bright Horizons Children's Centers, LLC v. Riverway Midwest II, LLC*, 931 N.E.2d 780, 792 (2010) (noting prior negotiations can be considered, including particular words and phrases); *CFC Inv., L.L.C. v. McLean*, 900 N.E.2d 716, 722 (Ill. App. Ct. 2008) (same). Under the UCC, conduct during the course of performance can shed light on the understanding between the parties. *Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.*, 891 N.E.2d 1, 27 (Ill. App. Ct. 2007) (quoting *Scott v. Assurance Co. of America*, 625 N.E.2d 439, 443 (Ill. App. Ct. 1993)). It is also "relevant to show a waiver or modification of any term inconsistent with the course of performance." 810 ILCS § 5/1-103(f).

### A. FOB

The contract provisions at issue are the FOB shipment term and ASCO's Standard Terms and Conditions. The Parties do not dispute the chosen shipment term - FOB. Traditionally, in a shipment contract, the buyer bears the risk of loss during shipment because titles passes once the freight is picked up. Pursuant to U.C.C. § 2-319, unless otherwise agreed, the delivery term "F.O.B. place of shipment" means "the seller must at that place ship the goods in the manner provided in this Article (Section 2-504) and bear the expense and risk of putting them into the possession of the carrier." The seller's delivery is complete (and the risk of loss passes to the buyer) when the goods pass into the transporter's possession. The buyer is responsible for all costs of carriage. "FREE ON BOARD," Black's Law Dictionary (11th ed. 2019).

Because the Parties agreed to FOB, the risk of loss passed to ASCO when Transport took possession over the goods at CMCO's dock. In solely applying the FOB term, ASCO is responsible for the loss because the goods were damaged in transit when the carrier had possession of them. Even the company that owns ASCO had this understanding at the time the damage occurred. The Senior Director of Field Service Operations for Schneider Electric stated

in an internal email, "For all – this gear was sold FOB Jobsite per Allan so this is an ASCO and therefore overall SE issue to respond to quickly." Doc. 66-24, at 4. The Court's analysis would end here but for the potential application of ASCO's Standard Terms and Conditions.

## B. Section 2 of ASCO's Standard Terms and Conditions

At summary judgment, the Parties dispute how the FOB term is to be read with Section 2 of the Standard Terms and Conditions. CMCO first disputes whether it agreed to be bound by the Terms and Conditions at all. Second, CMCO argues Section 2 is essentially unenforceable because it is vague and ambiguous and/or CMCO complied with the terms. According to Plaintiff, CMCO failed to comply with its duty to suitably package the shipment protecting it from water damage as required by Section 2, which also placed the risk on CMCO for failures resulting from insufficient packaging.

### 1. The Final Agreement

As a general rule, an enforceable contract must include a meeting of the minds or mutual assent as to the terms of the contract. *Academy Chicago Publishers v. Cheever*, N.E.2d 981 (Ill. 1991). The Parties agree they had an enforceable agreement but disagree on which PO constituted their final agreement. They exchanged multiple POs but the only purchase order with the Terms and Conditions attached was dated August 9, 2018, which ASCO claims to be the final agreement. According CMCO, the Parties agreement and terms were finalized with the September 19, 2017 PO. CMCO disputes ASCO's asserted material facts as to whether the terms and conditions were attached to the purchase order, referenced in it, or confirmed by Mr. Gerber to be controlling. The Court agrees that ASCO misstates portions of Mr. Gerber's testimony.

ASCO sent the August 9, 2018 document months after the Parties negotiated and agreed to prior purchase orders. The sequence of events leading up to August 9, 2018, support the

Court's finding that the Parties already assented to their final agreement in September 2017. The September 19, 2017, purchase order was created after a lengthy discussion of the FOB term. ASCO is a sophisticated party that drafted it. The only change that appears on the February 1, 2018 PO was an updated delivery date. By August 9, 2018, CMCO had already provided ASCO a draft bill of lading for the shipment as well as weight and dimensions (July 12), invoiced ASCO for its work (July 30), and presumably complete its work as the shipment was days away from Transport's initial, expected pick up date. Between August 6 and 9, CMCO and Transport were feverishly discussing details of the loading process for the shipments that originally needed to arrive in Fort Meade by the end of August. Then on August 9, 2018, ASCO informed CMCO that it coordinated with Transport to pick up the shipment two weeks later. It also sent CMCO an email stating "I have attached revised PO # 942930, I have removed the amount from line item 1 and added line item 2." In reviewing the PO, the newly added line 2 is described as "Chillicothe Intermatic Timer" for $1,300. The Parties do not elaborate on the meaning of this addition. ASCO only provides the email it sent to CMCO with the new purchase order but nothing regarding a response or acceptance.

Based on the Parties conduct and statements, the Court finds the Parties intended the September 2017 PO to be their final agreement. Therefore, the August 9, 2018 PO with Standard Terms and Conditions must be construed as an attempted modification because it was not included in the parties' final agreement. Perhaps CMCO should have directed ASCO back to the Parties original agreement and terms but that failure does not mean it agreed to the new terms and conditions attached to the August 9 order. Under Illinois law, a valid modification of a contract must satisfy all the criteria essential for a valid original contract, including offer, acceptance, and consideration. *Urban Sites of Chicago, LLC v. Crown Castle USA*, 979 N.E.2d

480 (Ill. App. Ct. 2012). One party cannot unilaterally modify the parties' agreement without

mutual assent. *Id.* There is no evidence that they expressly modified their agreement. This is

bolstered by the undisputed facts that CMCO points out: CMCO did not quote or charge for such

services and ASCO never provided any directions, instructions, or guidelines for packaging to

CMCO.

To the extent ASCO suggests the Standard Terms and Conditions were already

incorporated by reference to the Parties' agreement, ASCO fails to offer a legal argument for

support. Such inclusion is not automatic under Illinois law. Parties "may incorporate by

reference all or part of another document" to their contract. *Cage v. Harper*, 42 F.4th 734, 738

(7th Cir. 2022). The party seeking to enforce the terms of an allegedly incorporated document

must show the parties intended to incorporate the document and make it a part of the contract.

*188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736–37 (7th Cir. 2002) (citing *Arneson v. Bd. of

Trustees, McKendree Coll.*, 569 N.E.2d 252, 256 (Ill. App. Ct. 1991)). That intention must be

"clear and specific." *Id*. Additionally, there is a difference when a contract refers to a specifically

named document as opposed terms located somewhere on the document. *Id.* (citing *Landmark

Structures, Inc. v. F.E. Holmes & Sons Constr. Co.*, 552 N.E.2d 1336, 1342–43 (Ill. App. Ct.

1990)).

Here, ASCO's Standard Terms and Conditions were not attached to POs prior to August

9 or on the reverse side of the POs. The POs only stated, "This contract is placed subject to the

conditions on the reverse side of this form." Notably, such language does not refer to a specific

document but rather, unspecified "conditions." *See e.g.*, *Landmark Structures*, 552 N.E.2d at

1342–43 (addressing a contract that stated "PER 'CONDITION OF SALE' REVERSE SIDE,"

but the reverse side of the page was blank). In *188 LLC*, 300 F.3d at 739, the Seventh Circuit

held that the language, "'[s]ales of all services and materials are subject to the general terms and conditions on the reverse side,' with nothing written on the reverse side, could not be read to incorporate explicitly any specific document" at the 12(b)(6) stage. The court further noted that the cited language may have been a preprinted form with a generic statement that meant if there were additional terms specific to a contract, they would be written on the back, or it could have been evidence of the parties' intent to incorporate. *Id*. However, the Court need not address this issue of incorporation further since it was ASCO's burden to make this argument. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (arguments that are "underdeveloped, conclusory, or unsupported by law" are waived); *Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 511 (7th Cir. 2020)).

### 2. Conflicting Contract Provisions

The conflicting contract provisions between FOB and Section 2 support the conclusion that Standard Terms and Conditions, or at least Section 2, were not part of their agreement. "Contradictory language in a contract is classically ambiguous." *Universal Guar. Life Ins. Co. v. Coughlin*, 481 F.3d 458, 464 (7th Cir. 2007) (citing *Yates v. Farmers Auto. Ins. Ass'n*, 724 N.E.2d 1042, 1045 (Ill. App. Ct. 2000); *Chastain v. Chastain*, 500 N.E.2d 998, 1000 (Ill. App. Ct. 1986)). Because of this contradiction, the Court can look to the extrinsic evidence i.e., the Parties' negotiations, course of performance, and trade usage. However, the Court will start with the language in the purchase order and the allegedly incorporated or agreed to Standard Terms and Conditions.

In support of its request for judgment, ASCO relies on the following language:

2. Delivery; Inspection; Rejected Products: Time is of the essence…For all shipments (domestic or international), Seller will own the Products from its manufacturing facility to Buyer's named place of delivery and title shall not pass and delivery shall not be deemed to occur until Buyer has received the Products at

Buyer's named place of delivery. *All risk of loss during carriage/transportation shall be the responsibility of Seller*, and the Products will be considered delivered only upon receipt at Buyer's named place of delivery in conformance with the terms and conditions of this Purchase Order. *Buyer has no obligation to obtain insurance while the Product is in transit from Seller's facility to Buyer's named place of delivery*. Seller will use Buyer's preferred carrier for transporting the Products from Seller's facility to Buyer's named place of delivery. Domestic shipments will be freight collect unless otherwise agreed to by Buyer's corporate logistics department. For international shipments, Seller shall make the Products available for export fully cleared from customs and shall arrange for delivery of the Products to the consolidating hub or to Buyer's specified carrier's container yard at the port of shipment. *Seller shall obtain all necessary export licenses and authorizations, and shall assume responsibility for all fees and costs associated therewith and with getting the Products ready for loading, including but not limited to export customs clearance and associated documentation fees. Seller shall be responsible for the costs of checking operations, packaging and appropriate marking which are necessary for the purpose of delivering the Products and shall also be responsible for loading of the Products at Seller's dock*. Seller shall provide, at Seller's cost, the delivery order and/or usual transport document required for Buyer to take delivery of the Products. . . . Notwithstanding the foregoing, Seller is responsible for any costs, fees, expenses or penalties incurred as a result of Seller's failure to hire a Buyer approved carrier without Buyer's prior written consent or to otherwise follow Buyer's instructions. . . . *All materials shall be suitably packed, marked, loaded and shipped in accordance with the requirements of common carriers. Damage to any material not so packed will be charged to Seller.* No charge shall be made by Seller for packing, boxing, drayage, loading or storage unless otherwise stated herein.

Doc. 71, at 27-28 (citing Doc. 60-2, at 2) (emphasis in original). ASCO primarily argues, "All materials shall be suitably packed, marked, loaded and shipped in accordance with the requirements of common carriers" clearly in places responsibility for packing and shipping on CMCO, the seller. It also contends the additional italicized language supports this interpretation.

The Court takes issue with the language in Section 2 for several reasons. Starting with the italicized language, as discussed more fully below, the first sentence of italicized language directly contradicts the FOB, as does the sentence before that title shall not pass until delivery. The Parties expressly agreed in the PO contract that the risk of loss passed at CMCO's dock, not "Buyer's name place of delivery." The second sentence ASCO chose to italicize is interesting

19

because "Buyer" (ASCO) clearly obtained insurance for the product which ASCS paid out even though it was supposedly under "no obligation" to do so. The third section italicized is inapplicable because it speaks to "export licenses" for international shipments whereas this was a domestic shipment and the section clearly distinguished between the two types of shipments and associated requirements. After those sentences, ASCO points out language that Seller is responsible for fees if Seller fails to hire a buyer approved carrier, but ASCO is the who one had to hire the carrier and did hire the carrier here based on the FOB term.

Most importantly, ASCO's position loses credibility by attempting to contravene an express bargained-for FOB term and Parties' agreement, particularly when it argues now that CMCO was responsible for shipping in addition to packaging. It writes:

> CMCO disingenuously argues that Plaintiff is relying on only one sentence in Provision 2 of PO 942930 Rev. C - All materials shall be suitably packed, marked, loaded and shipped in accordance with the requirements of common carriers – and that this sentence is allegedly passive and ambiguous. The sentence is clear in placing responsibility for packing *and shipping* on CMCO, the seller. Moreover, all of the additional relevant language in Provision two supports this logical interpretation. Doc. 71, at 29 (emphasis added).

The Court disagrees. Rather, CMCO vehemently refused to have any part in shipping as memorialized in Doc. 66-10.

Even in the beginning of the Parties' negotiations throughout the quoting process from January-May 2017, each quote and revision stated, in bold letters, **"F.O.B. Chillicothe, Illinois"** next to the total price for their goods and services. Then in September 2017, when ASCO drafted the initial purchase order, CMCO quickly challenged the inclusion of a higher price on the order and had to exchange emails with ASCO to learn the higher price of $22,428 including shipping. Matt Gerber CMCO staunchly told ASCO,

> *I did not, nor would I ever, agree to pay the freight costs.* It is simply not CMCO's policy to get involved with the freight other than coordinating the

trucks. That is why I provided you with the freight quote from the carrier rather than include it on my quote. The freight is the responsibility of ASCO or others. This is why we put "F.O.B. Chillicothe" on our quotes.

Thereafter, Adam Seid from ASCO apologized, stating, "That was a misunderstanding on my part. I thought that freight was covered by Chillicothe, so I asked to have the PO amount include the freight when issued." He then instructed another ASCO team member, "I made a mistake with the amount of the PO. The amount that Matt states, $301,100, is correct – the freight estimate should be subtracted. As per the email below from Matt, we will have to pay the freight separately (not handled by Chillicothe)." Based on that conversation, ASCO quickly sent a revised purchased order the following day. It included the corrected price without freight and with terms "F.O.B. Your Dock." Notably, there were no terms and conditions attached to the revised purchase order.

The closest involvement to shipping CMCO agreed to be part of was to recommend a freight company they had previously used. Even then, CMCO doubled down on the refusal to supply "shipping and shipping arrangements. On July 11, 2018, Mark Reinhold from CMCO sent ASCO an email with attached freight quotes and again made clear, as shown in Doc. 66-13.

> Please Note: *CMCO has not supplied freight in our scope of supply, Shipping and shipping arrangements are solely responsibility of ASCO.*
>
> We have requested the attached freight quotes from our local freight carrier per the general outline drawing for your use, let us know if you want to use Transport Logistics, freight billing would be directly to ASCO.

At the time, ASCO, who was clearly in agreement, told CMCO that they would look into their own transportation first. ASCO did communicate with other companies but ultimately chose Transport because of their lower cost and informed CMCO about two weeks after it made its decision.

Finally, the language "No charge shall be made by Seller for packing, boxing, drayage, loading or storage unless otherwise stated herein," does not excuse the fact that CMCO never included "packaging" or "packing" in its quotes for goods and services even if it was not going to specifically charge for it. Moreover, the Parties clearly agree packaging is an involved process. Even in the quoting process, CMCO detailed services it was going to provide in addition to goods. *See* Doc. 66-5. For example, it detailed what "assembly" of the steel sub-base meant – mounting, installing steel ground pads, and splitting for shipment. It described installing floor mounted equipment onto the sub-base, wiring, and painting. What the quote did not include is packaging for shipment or any involvement in the shipping process at all.

In sum, the Court cannot simply cut and paste different portions of Section 2 to fashion a requirement that the Parties intended, as ASCO suggests by asking the Court essentially only enforce the "suitably packed" portion of the sentence it relies on in Section 2. It is clear the Parties intended the FOB shipment term to govern their agreement. CMCO made clear during quoting that this contract would include FOB CMCO's dock. ASCO did not object during the quoting or ask that shipping and freight be included in the quote. Yet, at some point, when ASCO drafted the purchase order it attempted to include such terms, likely because that was ASCO's standard preference when purchasing goods. The more natural reading of the negotiations is that ASCO forgot to alter its standard terms and conditions when it changed the shipping designation or ASCO did not intend to add additional terms to this particular contract. Section 2 clearly has terms that contradict FOB.

For these reasons, the Court finds the bargained-for FOB term prevails over Section 2 and the Court will not rewrite the contract to enforce two words within contradictory sentence and section to the Parties' express contract. *See, e.g., Cromeens, Holloman, Sibert, Inc v. AB*

*Volvo*, 349 F.3d 376, 384 (7th Cir. 2003) ("The court also declined to apply the IFDA because to do so would allow a general choice-of-law provision to trump a specific contradictory term of a bargained-for contract between sophisticated parties."); *Cage v. Harper*, 42 F.4th 734, 738 (7th Cir. 2022) (refusing to read incorporated "Regulations" as trumping an express term which gave a conflicting severance time period but still finding the Regulations governed where the employment agreement was silent). No disputes of fact need resolved for the Court to find judgment in CMCO's favor that it did not breach the parties' agreement.

ASCO also includes some exhibits with its motion for partial summary judgment which support the Court's inclination that packaging was never part of CMCO's responsibilities, and if anything, ASCO believed it to be Transport's role. It submits an email from Adam Seid discussing another carrier, A & A Transfer, which ASCO planned to use to move the damaged equipment back to CMCO and Adam remarks, "I guess with Transport Logistics being at $52K, you get what you pay for." Doc. 60-10, at 23. Adam also sent an earlier email to someone within CMCO asking if he knew of a company that specially packaged equipment prior to shipment. *Id.* at 26-27. That person responded by suggesting CMCO may know of someone who packages equipment of this size. *Id.* at 26.

## C. "Requirements of Common Carriers"

Assuming CMCO agreed to "suitably pack[], mark[], load[]and ship[] in accordance with the requirements of common carriers," it complied with such term. Remarkably, ASCO asks the Court to entirely ignore the common carrier who actually had a role in this case. Yet, the terms ASCO so strongly argues to enforce specifically called for an accordance with the requirements of common carriers. ASCO does not identify an appropriate standard in their brief, but its cited expert report opines it should have received the full "boat wrap."

At the outset, "the requirements of common carriers" references a standard created by a non-party to the contract. The sentence does not reference any electrical industry standards or the seller's guidelines for packaging electrical switchgear, which ASCO admits it had. Even after the Terms and conditions were sent, it is clear the Parties still agreed to FOB. ASCO still engaged Transport to move the shipment and paid them to do so. Transport picked up the shipment with no contest. It did not request that CMCO do anything differently despite walking around the shipment, seeing the clear wrap, and deciding to add tarp. On top of that, ASCO does not disagree that Transport acted as its agent. ASCO offers no argument why the Court should not consider Transport's conduct other than circular ones. It argues "any failure Transport to identify and reject faulty packaging by CMCO does not relieve CMCO of its responsibility to ASCO under PO 942930 Rev. C." But that PO specifically calls for the requirements of a common carrier. Not only is Transport Logistics/Transport National – a common carrier, but it is also the carrier that ASCO **chose**. Thus, ASCO is asking the Court to save it from the language it drafted but also from the conduct of the carrier, and likely agent, it chose. The Court sees no reason why it should ignore Transport's actions and apply some other, unidentified trade usage. In applying it, CMCO complied with this term since Transport accepted the shipment as it was.

ASCO raises other arguments that were underdeveloped but do not ultimately matter. ASCO claims CMCO gratuitously undertook a packaging duty by wrapping it 180 degrees. This argument is not outcome determinative because for the reasons above, CMCO complied with the packaging duty if one was imposed. ASCO also argues CMCO should have known how the switchgear should have been wrapped (encased in cardboard and fully wrapped 360 degrees) because it observed the original packaging when ASCO had it shipped from California to CMCO. ASCO does not identify who observed that and under what legal theory it would be

appropriate to hold CMCO accountable to that type of packaging. Even if someone from CMCO who had involvement in the second shipment had observed the original packaging, that does not mean it was required to perform that packaging as opposed to a carrier.

### D. Expert Reports on Causation for the Damage

ASCO argues "there is substantial evidence that CMCO's method of packaging the electrical switchgear was deficient[.]" Yet, the lead designer of the electrical switchgear from Schneider Electric thought the galvanized plates over the floor conduit openings would have been adequate to keep water from getting up into the switchgear, and the shrink wrap "sound[ed] good as long as the underside was protected." ASCO points to Defendant Transport National and Transport Logistics' trucking expert, Bruce Rugemer, and Plaintiff's cargo expert Captain Ivo Knobloch that opined CMCO's failure to properly package the cargo caused the water infiltration damage during the four-day transit from Illinois to Maryland. Specifically, Plaintiff's expert, Captain Ivo Knobloch, opines that CMCO's packaging did not comply with "contractual obligations or with the applicable standards of shipping moisture sensitive electronic machinery. The lack of proper protection resulted in catastrophic damage/loss of the Switchgear." CMCO did not disclose any liability or damages expert in this case. However, CMCO contends neither expert is qualified to render opinions regarding the meaning of the contract between CMCO and ASCO, and neither expert provided any opinions as to the packing requirements of common carriers. In addition, CMCO argues nothing in the purchase order, or in the standard terms and conditions, references electrical industry standards for shipment of electrical switchgear.

The Court agrees that the expert reports do not ultimately matter because of the Parties' agreement and CMCO compliance with it. This was a complicated shipment process. ASCO's customer told them it was a lengthy process and that the trucking company should plan at least

10-15 days travel time to make the delivery. Doc. 66-15, at 6. The loads were extremely heavy, over 300,000lbs in total. It required special permits and escorts for delivery to the military base end-user. ASCO even remarked that the bill of lading had to be typed otherwise, the deliver driver to Fort Meade would be rejected. ASCO and Transport exchanged numerous emails about the lengthy loading process, the use of cranes, prints of the loads, and repeated confirmations of the dimensions and weight for each section. Yet, in all of these discussions, there was nothing regarding the protection of this $4 million equipment that could be in transit up to 15 days. Either all of the Parties expected one another to protect the shipment from potential water damage or they all believed CMCO's and Transport's actions were sufficient but the shipment was somehow unfortunately damaged. Simply put, ASCO cannot point to anything that contractually required CMCO to package the Switchgear in any other manner than it did. Nor can ASCO identify anything in the UCC or otherwise that required CMCO to package differently.

On a more practical note, this was ultimately ASCO's product that was going to the end user. CMCO was engaged to add goods and services to it. But it was ASCO who chose CMCO to add steel enclosures and steel sub-bases to ASCO's electrical switchgear and chose multiple carriers to transport the product at various points. ASCO is one who knew the detailed values of each part of the product and knew that it was going to be transported via open flat bed trucks. It cannot claim ignorance to the circumstances it controlled.

## II. Implied Warranty of Merchantability and Bailment (Counts II and III)

Notably, ASCO does not ask for summary judgment on Counts II and III in its motion for partial summary judgment. In response to CMCO's motion for summary judgment, ASCO's remarks on why the remaining Counts should survive summary judgment are brief. As to the breach of implied warranty of merchantability, ASCO argues the express contract created an

implied warranty of packaging. Doc. 71, at 33. CMCO disagrees and further claims ASCO had the opportunity to inspect the equipment either itself or through its agent and the alleged packaging defects were open and obvious at the time.

According to the Uniform Commercial Code cited in the Complaint, "(2) Goods to be merchantable must be at least such as . . . (e) are adequately contained, packaged, and labeled as the agreement may require." NJ Rev Stat § 12A:2-314 (2016). Additionally, under the UCC, buyers and sellers can modify implied warranties through their course of dealing and a buyer cannot bring a claim about implied warranties when it had an opportunity to inspect that product and should have discovered any defects. *Ellengee Mkt. Co. v. Phenix Specialty Films, LLC*, 556 F. Supp. 3d 874, 885–86, 88 (N.D. Ill. 2021).

Regardless of inspection which Transport (as ASCO's agent) arguably did, an implied warranty for packaging is based on what is required in the agreement. Based on the discussion in the section above, the final agreement between the Parties did not include packaging responsibilities and even if it did, CMCO met those duties. Therefore, summary judgment on this claim is likewise granted.

With respect to the bailment claim, CMCO argues it is entitled to summary judgment because the switchgear was not damaged while it was in CMCO's "care, custody, and control." Rather, it was in good condition when it was delivered to ASCO's agent, Transport, at CMCO's docks. At that point the switchgear was returned to ASCO's care, custody, and control. ASCO responds by claiming a CMCO witness observed a Transport driver use a tarp with water on it, which ASCO now suggests could have caused the water damage.

"Under Illinois law, 'bailment is the delivery of goods for some purpose, upon a contract, express or implied, that after the purpose has been fulfilled the goods shall be redelivered to the

bailor, or otherwise dealt with according to his directions, or kept till he reclaims them.'" *In re Mississippi Valley Livestock, Inc.*, 745 F.3d 299, 303 (7th Cir. 2014) (quoting *Kirby v. Chi. City Bank & Trust Co.*, 403 N.E.2d 720, 723 (Ill. App. Ct. 1980)); *Berglund v. Roosevelt Univ.*, 310 N.E.2d 773, 775 (Ill. App. Ct. 1974) ("Bailment is defined as the rightful possession of goods by one who is not an owner."). "To recover under a bailment theory, a plaintiff must establish (1) an express or implied agreement to create a bailment; (2) a delivery of the property in good condition; (3) the bailee's acceptance of the property; and (4) the bailee's failure to return the property or the bailee's redelivery of the property in a damaged condition." *Toll Processing Servs., LLC v. Kastalon, Inc.*, 880 F.3d 820, 827 (7th Cir. 2018) (quoting *Wausau Ins. Co. v. All Chicagoland Moving & Storage Co.*, 777 N.E.2d 1062, 1067 (Ill. App. Ct. 2002)).

Based on their briefs, the Parties agree they created a bailment at some point and CMCO first received ASCO's property in good condition. ASCO does not disagree that the bailment ended when Transport loaded the equipment onto the truck, before tarping and before the water infiltration. This is bolstered by the undisputed fact that Transport driver Woodrum walked around the switchgear before it was loaded onto his truck and observed no damage to it. That ASCO claims CMCO observed Transport use a wet tarp does not matter because the bailment had already ended at that point. "A bailment terminates when the subject matter of the bailment is returned by the bailee." 4A Ill. Law and Prac. Bailments § 14 (2022) (citing *Kassvan v. Thomas E. McElroy Co.*, 179 F.2d 97 (7th Cir. 1950)).

ASCO informed CMCO that it had chosen Transport to load and pick up the shipment on a scheduled date. Therefore, CMCO had complied with such direction, which ended the bailment. Moreover, ASCO fails to explain how CMCO would have owed any duty to ASCO after the bailment ended. If ASCO truly believes the portion of a previously wet tarp caused the

28

$1.8 million damage in this case, then its issue is with Transport, not CMCO. For these reasons, summary judgment is granted as to Count III.

Finally, the Court notes it did consider arguments raised in the Transport Defendants' summary judgment briefing with respect to the appropriateness of allowing CMCO to be terminated as a Defendant in this case. The Court finds it is and order the same. Summary judgment is granted on all counts as to CMCO.

## CONCLUSION

For the reasons set forth above, Plaintiff AGCS Marine Insurance Co. Inc.'s Motion (Doc. 60) is DENIED and Defendant Chillicothe Metal Company Inc.'s Motion (Doc. 66) is GRANTED. The Clerk is ordered to terminated CMCO as a Defendant.


Signed on this 19th day of January, 2023.

s/James E. Shadid
James E. Shadid
United States District Judge